RECEIVED

2017 JUL 11  PM 4: 15

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**Western(Memphis) DIVISION**

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

| | |
|---|---|
| **BROOKE HYMAN**<br>**1928 Jefferson Avenue**<br>**Memphis, TN 38104**<br><br>　　**Plaintiff,**<br><br>　　**v.**<br><br>**SHELBY COUNTY PUBLIC**<br>**DEFENDER'S OFFICE**<br>**600 Adams Avenue**<br>**Memphis, TN 38105**<br><br>　　**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **C. A. NO.:** |

## COMPLAINT

Plaintiff Brooke Hyman, by and through undersigned counsel and for her Complaint, states as follows:

### JURISDICTION AND VENUE

1.　　The Court has subject matter jurisdiction of this action pursuant to 5th, 13th and 14th Amendments to the United States Constitution, 28 U.S.C. § 1343, 42  U.S.C. §§ 1332, 1343, 1391(a), Title VII, 42 U.S.C. §§ 2000ed and as well as supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. §1367 (a).

2.　　This Court has personal jurisdiction over the defendants because they are located in the Shelby County, Tennessee.  Venue is proper within the jurisdiction of Shelby County, Tennessee.

1

## PARTIES

3.      Plaintiff **Brooke Hyman** is an African-American female who resides in Shelby County of the State of Tennessee and who worked for Defendant Shelby County Public Defender's Office.

4.      Defendant **Shelby County Public Defender's Office ("SCPD")** is a

_____ operating in Shelby County, Tennessee.

## FACTUAL BACKGROUND

5.      Ms. Hyman started her career with SCPD in May 2011 as an unpaid intern.

6.      Ms. Hyman continued to work as an intern until January 2012, when SCPD promoted her as a temporary, paid employee.

7.      Ms. Hyman continued to work with SCPD as a temporary employee until July 4, 2012 when SCPD promoted her as a full-time Assistant Public Defender.

8.      Ms. Hyman was accepted into the Southern Public Defender Training Conference Core 101 program from July 29 through August 11, 2012.

9.      A Caucasian female (CF 1) was also accepted into the Southern Public Defender Training Conference Core 101 program at the same time as Ms. Hyman.

10.     During this conference, Caucasian Female 1 disclosed to Ms. Hyman that she had issues applying for a previous Bar exam because of her history of mental illness and prior involuntary commitment.

11.     During the first day of the training, Caucasian Female 1 went on to explain to Ms. Hyman that she had applied for numerous jobs and had not been hired because she was "crazy."

12.     She explained however, that during her interview with the Chief Public Defender,

2

Mr. Stephen Bush (Caucasian Male), when she told Mr. Bush that she was crazy, that he said "that's great you will be able to relate to our mental health clients."

13.     Because Ms. Hyman had just met Caucasian Female 1, she was concerned by this information but assumed she was exaggerating.

14.     On and around July 29, 2012, Mr. Bush set up an interview for the two Fellows, CF 1and another Caucasian female ("CF 2").

15.     Apparently, a reporter from the Commercial Appeal called CF 2 to discuss the fellowship but did not call CF 1.

16.     CF 1 found out and became very upset and made outbursts to CF 2 exclaiming "that's great! Apparently Stephen likes you more than me because you are a skinny young girl and you went to Yale for Law School!"

17.     On and around July 30, 2012, CF 2 approached Ms. Hyman and was very concerned.

18.     CF 1 kept approaching CF 2 and asking why would Mr. Bush ask them to interview CF 2 and not her. "I'm just as good as you" CF 1 would demand.

19.     CF 2 began to feel threatened from the repeated comments and pointed questions. CF 2 became so concerned during the training conference that she asked Ms. Hyman if she could hang out in Ms. Hyman's room because she didn't want to be in a room alone with CF 1.

20.     Ms. Hyman obliged. Thereafter, CF 2 spent a great deal of time in Ms. Hyman's room for the rest of the day and the remainder of the two week training in order to avoid CF 1. CF 1 and CF 2 were actually roommates. While Ms. Hyman was in a room alone.

21.     Between July 29 and August 11, CF 1 continued to make inappropriate comments

3

to CF 2 and then began saying similar things to Ms. Hyman.

22.     CF 1 also disclosed to the entire training group that she had been committed to a mental health facility while attending college.

23.     She explained that her behavior had become so erratic while at college that she was asked to leave and not return.

24.     She explained that she was working for a professor and had some issues with another student. The professor became afraid after CF 1 made threats of harm against the other student.

25.     She explained that she was committed to the mental health facility after her behavior and threats were disclosed. Ms. Hyman never researched or verified what CF 1 shared with the group.

26.     According to Ms. Hyman, CF 1 had numerous behavioral "episodes" throughout the two week training period. She screamed and cried during one of the training sessions.

27.     At one point, she told Ms. Hyman "you should have been in my session. I screamed and cried and rolled on the floor and told everyone about my mental health issues and prior involuntary commitment."

28.     Mr. Jon Rapping is the creator of the program. CF 1 had repeated issues with him during the training session and screamed at him.

29.     Mr. Rapping was also concerned about CF 1's behavior. The entire group was preparing to take a trip to a site in Birmingham. CF 1 began rocking back and forth in her seat. She started screaming and crying and acting hysterical. The facilitators were forced to clear the room. She was so disturbed that she was excused from the activities for the rest of the day.

4

30. The facilitators suggested that Ms. Hyman and CF 2 take CF 1 to grab some food and skip the tour. Ms. Hyman and CF 2 agreed.

31. Ms. Hyman called her sister, Brittany Hyman, and expressed her concern and fear. Ms. Hyman told her sister that CF 1 was scary and that she was not comfortable.

32. Ms. Hyman also called Nelle Pallme (Caucasian Female) and supervisor with SCPD about her concerns. She fully disclosed CF 1's behavior. Ms. Hyman made it clear that she was not comfortable with CF 1's behavior.

33. CF 1 disclosed to Ms. Hyman that she would not seek medical treatment or counseling because she refused to report further mental health treatment to the Bar Examiners.

34. Before the training was over, Mr. Rapping said he was going to call Mr. Bush and discuss CF 1's behavior.

35. Mr. Rapping also said he would recommend to Mr. Bush to make sure Ms. Hyman and CF 2 were not working closely with CF 1 as a measure to avoid further issues.

36. Although this recommendation was advised and Ms. Hyman specifically made her concerns known, CF 1 was placed in the same courtroom with Ms. Hyman.

37. During their time in the courtroom together, CF 1 would have numerous outbursts and disruptive behaviors.

38. Ms. Cathy Silverstein (Caucasian-American female) witnessed CF 1's erratic behavior in court and also expressed concerns to management.

39. By the end of 2012, the entire SCPD office was aware of CF 1's mental health issues. This was so because, not only did she openly tell staff that she was crazy, but her behaviors also corroborated what she personally told the staff.

5

40.    At times thereafter, CF 1 would confide in Ms. Hyman details about her relationship with Mr. Bush.

41.    CF 1 would make comments about how Mr. Bush "needed her to really get special projects off the ground." However, at the same time, CF 1's case load was decreased because she was too stressed to handle a standard caseload.

42.    CF 1's relationship with Mr. Bush became more curious over time. And CF 1's behaviors worsened after Ms. April Frazier-Camara (African-American Female) arrived to the Juvenile Division in July 2014.

43.    On Ms. Camara's first day of work, Ms. Hyman and CF 1 took Mrs. Camara to lunch to welcome her to the new job.

44.    Ms. Hyman's sister was also present during the lunch. During the lunch meeting,

45.    CF 1 appeared very distraught.  She was worried about a case she was handling and received an email from the prosecutor while at the table eating lunch.  In response to the email from the prosecutor, CF 1 began crying hysterically and shaking.

46.    Ms. Hyman attempted to calm CF 1 down and gave her tips on how to respond in the case. Ms. Hyman's sister was alarmed by CF 1's behavior and expressed concern for Ms. Hyman's safety.

47.    CF 1 became so erratic that Ms. Hyman was forced to leave the lunch.

48.    CF 1 confided to Ms. Hyman that she wanted Mrs. Camara's position. CF 1 also confided in Ms. Hyman that she would talk to Mr. Bush at all times of the day.

49.    She indicated that Mr. Bush needed her and that her relationship with Mr. Bush was different for this reason.

6

50.     CF 1 often discussed her inevitable promotion to special assistant to Mr. Bush. Upon Ms. Camara's arrival, CF 1 began to misbehave.

51.     She often openly discussed her dislike of Mrs. Camara and her belief that Mrs. Camara stole her job. She expressed that Ms. Camara was impeding her special relationship with Mr. Bush.

52.     A few months later, in and around August 2014, CF 1 shared with Jail Diversion Manager, Kena Vassar (African-American Female), that she was in distress about work.

53.     CF 1 stated to Ms. Vassar that she contemplated committing suicide by jumping out the office window because Mrs. Camara had taken her job and she didn't have anything to live for.

54.     CF 1 consistently displayed erratic, unstable, and volatile behavior, which included yelling, crying, stomping around the office, and having emotional melt downs in the workplace.

55.     As a result of CF 1's inability to manage the stress of litigation, the Public Defender Office stopped entrusting her with client cases-an extremely critical aspect of serving as a public defender.

56.     For instance, during one of the last court appearances before she was banned from handling client cases, she began screaming and crying in court.

57.     Ms. Hyman was present during CF 1's last Juvenile Court appearance. Ms. Barbara Deans (African-American female) was also present.

58.     During the state's argument, CF 1 became visibly upset and began swaying back and forth. The judge asked CF 1 to respond. CF 1 began crying. She cried throughout the

7

proceeding.

59.    At some point, CF 1 began sobbing. She began yelling and screaming in an aggressive manner at the State. Her behavior became so erratic that the Court Deputies began to approach CF 1 to diffuse the situation.

60.    The judge asked her repeatedly to calm down and direct any relevant comments to the Court and not the state.

61.    CF 1 also described to Ms. Hyman incidents of her increasingly aggressive and violent behaviors during January, February, March, and April 2015.

62.    CF 1 explained that she had been unhappy with the cable installation at her home. She called repeatedly and made threats to her cable provider. The cable provider sent out a service technician.

63.    CF 1 became so angry that she threw items including cable equipment at the service technician and struck him.

64.    CF 1 also expressed thoughts about hurting herself to Ms. Hyman. Ms. Hyman became increasingly uncomfortable about CF 1's aggressive behavior, threats to harm herself and others.

**The April 9 Incident**

65.    On and around March 2015, the Public Defender Office transitioned to a new style of defense practice, referred to as holistic team based practice.

66.    As Special Assistant, Mrs. Camara was responsible for organizing this transition. Mrs. Camara took on a leadership role in transitioning the office to this new form of practice.

67.    CF 1 became very concerned about what her role would be in the new team

practice model. CF 1 was concerned that her job was at risk because she did not handle client cases (litigation).

68.    However, on March 26, 2015, the office had a training session for the entire staff on the new defense practice model, which was led by Mrs. Camara.

69.    Ms. Hyman was present during this meeting. During this meeting the office outlined staff assignments, responsibilities, and office procedures.

70.    During the meeting, CF 1 became unstable loudly questioning what her role would be on the teams and whether she was required to take on client cases again.

71.    Ms. Hyman observed CF 1 repeatedly interrupt Ms. Camara and yell out questions about her role and why she didn't have cases.

72.    CF 1's behavior made the entire meeting very uncomfortable and her deterioration concerned the participants.

73.    She left the room and came back visibly upset. She continued to be loud and disruptive during the meeting. Stomping in and out of the meeting, making audible noises to interrupt the meeting.

74.    Mr. Bush was present during the meeting and attempted to calm CF 1. He told her that he would discuss her concerns with her later.

75.    At some point, CF 1 got up and stormed out of the meeting. She was observed by staff leaving the meeting, going into the restroom, crying and pulling her hair.

76.    She later returned to the training with a red face which appeared to Mrs. Camara and others that CF 1 had been crying. Thereafter, CF 1 was visibly upset for the rest of the meeting.

77.    CF 1 did not handle that meeting well. Between March 30 and April 3, 2015, CF 1 took sick leave.

78.    CF 1 later told several staff members that she was on sick leave for mental health reasons and pursuant to doctor's orders.

79.    During the week of her sick leave, she came into the office twice against doctor's orders to attend meetings, and on both occasions she appeared very anxious and not well.

80.    CF 1 returned to work from sick leave on Monday, April 6, 2015.  On her first day back in the office, CF 1 became angry at other staff members who were talking in the office.

81.    She became visibly angry, irrational, and began slamming office doors. Ms. Hyman found CF 1's refusal to remain at home on medical leave especially troubling due to CF 1's prior refusal of treatment in August 2012.

82.    Ms. Hyman was immediately concerned and feared CF 1 would not comply with treatment if she felt her job were in jeopardy.

83.    On April 8, 2015 and in response to this incident, Mr. Bush requested that CF 1 move her work space to a private office with a door located at 140 N. Main in order to avoid any future incidents with other staff members.

84.    On the morning of April 9, 2015, CF 1 came into the juvenile defender office at 600 Adams Ave to pack her belongings in order to relocate to the 140 N. Main location.

85.    While she was doing so, CF 1 expressed ideations about killing Ms. Hyman and Mrs. Camara to staff-member Patrina Robinson (African-American Female).

86.    Given CF 1's unstable behavioral patterns, her inability to manage stress, her obsession with Mrs. Camara's job, her previous suicidal ideations and her overall imbalanced

10

temperament dating back to 2012, Ms. Hyman did not take such homicidal threats from CF 1 lightly. Ms. Hyman immediately feared for her health and well-being.

87.     This incident was reported to Mr. Bush immediately by Mrs. Camara on the afternoon of April 9, 2015.

88.     On Friday, April 10th, CF 1 returned to the juvenile office and continued to have access to the building. On April 10th, Mrs. Camara emailed Mr. Bush to raise concerns about the safety of Brooke Hyman and whether she was made aware of the threat against her life by CF 1.

89.     On Monday, April 13th CF 1 continued to come to the juvenile office and had access.

90.     Vicky Lyon (Caucasian-American female) from Shelby County Human Resource was assigned to investigate the matter, and she conducted a phone interview of Mrs. Camara to gather the facts regarding the matter.

91.     Mrs. Camara stated to Ms. Lyon that she was concerned for her safety, because she felt that CF 1 could possibly act on a threat to harm her due to her long-standing hostility toward her and her struggle with mental illness.

92.     Ms. Lyon also interviewed the entire staff in the juvenile unit regarding CF 1's behavior. Staff also reported to Ms. Lyon about Ms. Sanbury's disruptive behavior, and many staff raised the issue about the inappropriate nature of Mr. Bush's relationship with CF 1.

93.     This unusual relationship between Mr. Bush and CF 1 was not only noticed by Ms. Hyman and Mrs. Camara, but by other staff throughout CF 1's entire employ.

94.     On April 17, 2015, Ms. Lyon came to the Juvenile Defender office and called the entire staff into the conference room to provide an update regarding the investigation.

95.     During this meeting, Ms. Lyon stated that all staff reported and confirmed CF 1's disruptive behavior, and Mr. Bush decided to remove CF 1 from the juvenile team.

96.     She reported that CF 1 would no longer have access to the 600 Adams office, and she also provided materials on the Employee Assistance Program, CONCERN, to assist staff with any emotional health issues they may be facing due to this incident.  Ms. Lyon also reported that the investigation was still ongoing.

### Shelby County Government's Prohibition Against Violence

97.     Shelby County Government has a strict prohibition policy against violence in the workplace. The policy states in part as follows:

**PROHIBITION AGAINST VIOLENCE**

Shelby County Government *does not tolerate any form of violence*. This *includes any type of* physical or *verbal attack on anyone in the workpl*ace.

Shelby County expects respectful behavior at all times toward all persons in the workplace including co-worker and citizen customers. Any form of violence or failure to act in a respectful way towards any person in the workplace will subject employees to disciplinary action which may include termination.

### Stephen Bush's Inappropriate Relationship with CF 1 Sansbury

98.     As stated above, CF 1 confided in Ms. Hyman about her very close and intimate relationship with Mr. Bush.

99.     CF 1 had shared with Ms. Hyman and Mrs. Camara often that her and Mr. Bush were working late together on projects, and she received texts and emails from Mr. Bush at 2 and 3 am in the morning.

100.    CF 1 took care to make it clear that she enjoyed favor from Mr. Bush, and as a result she was allowed and entrusted with special projects unlike other assistant public defenders.

12

### The July 28, 2015 Memorandum

101.    After the April 9 incident, the SCPD conducted a preliminary investigation into CF 1's violent actions. Nearly four months later, Sherrye J. Brown issued a confidential memorandum on July 28th, 2015 to Ms. Hyman and Mrs. Camara on behalf of SCPD. The memorandum listed findings in part as follows:

> A serious employee incident was reported on April 9, 2015. . .
>
> The employee incident resulted from a verbal communication from one employee to another in which threatening language of harm was used . . .
>
> The communication constituted unacceptable language.
>
> Staff members were placed in fear as a result of the incident.
>
> Regular office operations were disrupted as a result of the incident.
> . . .
> Proper steps have been taken to assure that we continued to maintain a safe workplace.
> . . .
> Your health and well-being as a valued employee of this division are important. . .

102.    Mrs. Brown also advised Ms. Hyman that CF 1 would not have access to the workspace at 600 Adams.

103.    Thereafter, between April 2015 and October 2015, CF 1 did not have access to the 600 Adams building. Ms. Hyman felt relieved and safe that CF 1 was denied access to the 600 Adams office.

### October 2015

104.    However, in and around October 2015, without any prior notice provided to Ms. Hyman, CF 1 appeared at the 600 Adams building for a "social visit."

105.    Ms. Hyman immediately contacted Ms. Donna Armstard because she did not feel

13

safe. Ms. Armstard contacted Ms. Sherrye Brown on behalf of Ms. Hyman.

106.    Ms. Brown advised that CF 1's threats were not real so SCPD had no ability to restrict CF 1's movement to certain buildings.

107.    Ms. Hyman contacted Ms. Brown to express her concerns about her safety in the presence of CF 1 and her apparent access to 600 Adams. Ms. Hyman had the below email exchange:

> *Good Afternoon,*
>
> *I just wanted to touch bases with you about [CF 1] access to 600 Adams Ave Memphis, TN 38105. I was under the impression even after the close of the investigation [CF 1]would be not be allowed to come to 600 Adams Ave. I have attached the letter I received on July 28, 2015. The letter states that "Proper steps have been taken to assure that we continue to maintain a safe workplace." [CF 1] was previously denied access to 600 Adams Ave. The email from Vicki Lyons is attached. It was my impression that her access to 600 Adams Ave would continue to be denied as a result of her threats. I have also attached a follow up email after receiving the memo, addressing my concerns about continued interaction with [CF 1].*
>
> *Throughout this process, I have been cooperative and forthcoming. And although I was not in complete agreement with the results of the independent investigation, I accepted the results and moved forward. [CF 1] has not been to 600 Adams (that I know of) since the April 9, 2015. On Wednesday, October 28, 2015, [CF 1] came to 600 Adams Ave and was buzzed in. [CF 1]stayed at 600 Adams Ave for approximately thirty minutes for apparent social reasons.*
>
> *Because [CF 1] was standing very close to my office, I excused myself from the area. And I addressed my concerns with my supervisor, Donna Armstard. She was very helpful.*
>
> *I am not asking for [CF 1] to be excluded from trainings, meetings, or any office wide events. I am asking that limitations and restrictions regarding her ability to access 600 Adams Ave remain in place as safety measure. I would absolutely prefer for a person that has made threats of death and bodily harm against me to be prohibited from making social visits at 600 Adams.*

### SCPD's Demotion, Refusal to Promote and Constructive Termination of Ms. Hyman

14

108.    In November 2015, after Ms. Hyman complained about CF 1's access to 600 Adams, SCPD informed her, through Ms. Armstard of changes within the Juvenile Department.

109.    Ms. Armstard advised that Ms. Hyman would no longer be assigned to JDU. She would become a liaison for adult court and the transfer team.

110.    In this capacity, Ms. Hyman would be allowed to begin accepting adult criminal cases as well as being a member of the newly formed transfer team.

111.    However, shortly thereafter, Ms. Hyman learned that her office had decided to go in a different direction than was previously explained to her.

112.    She was advised there would no longer be a transfer team. Ms. Hyman was given no additional information.

113.    Although Ms. Hyman was told there was no transfer team and that her role with the transfer team was no longer needed, she began to receive notice of CF 1's participation in the supposed transfer team that was eliminated.

114.    The SCPD case management system was updated to reflect CF 1's position with the transfer team. Ms. Hyman was not given access to the transfer team listserve within the case management system.

115.    Ms. Hyman became concerned about the difference in the information she was provided and the apparent circumstances of a transfer team including CF 1.

116.    She contacted Mr. Bush and Ms. Brown to discuss the matter. However, Ms. Brown and Mr. Bush refused to meet with Ms. Hyman. Ms. Hyman attempted to set up meetings with management and management refused to meet with her multiple times.

117.    As a result of SCPD ignoring Ms. Hyman's safety concerns and her request to

glean information about the transfer team, she was constructively terminated and forced to submit her resignation.

118.    Ms. Hyman also had made repeated requests to move to another division or be able to handle adult cases.

119.    After it became clear that she would be unable to advance in the SCPD, that her safety was not a priority, and that Mr. Bush gave CF 1 preferential treatment because of their inappropriate relationship, Ms. Hyman was forced to resign effective February 19, 2016.

120.    The above-stated actions by SCPD by and through Mr. Bush and his Deputy Public Defender Sherrye Brown clearly constitutes many violations of federal law prohibiting discrimination in the workplace.

121.    First, Ms. Hyman suffered sexual harassment because she was not shown the same treatment as CF 1-who willingly had an inappropriate relationship with Mr. Bush.

122.    And Ms. Hyman was discriminated against because of her race.

123.    Additionally, not only was CF 1 less qualified than Ms. Hyman, but CF 1 proved inept at participating in client-case litigation.

124.    Moreover, CF 1 violated Shelby County policy against violence in the workplace. However, Mr. Bush's inappropriate relationship with CF 1 facilitated her continued employment at the SCPD despite her apparent incompetence, mental instability and mental illness created a hostile work environment for Ms. Hyman and others.

125.    The preferential treatment that Mr. Bush and the SCPD showed for CF 1 over Ms. Hyman is steeped in Mr. Bush's apparent favoring for CF 1 based upon her race and her obsession with him personally.

16

126.   Mr. Bush openly exploited CF 1's mental illness, her ineptitude, and her covetous desire for Mrs. Camara's job as a means to create a hostile work environment for Ms. Hyman and others and to create a forced resignation of Ms. Hyman.

127.   In essence, Mr. Bush exploited CF 1's weaknesses and her obsession and fixation over him to the detriment of Ms. Hyman and other SCPD staff in order to hire and retain unqualified Caucasian Americans within the SCPD.

128.   Mrs. Hyman was a victim of Mr. Bush's racial animus and inappropriate relations with CF 1.

### COUNT I
Race Discrimination
42 U.S.C. §§ 2000e, et seq, Title VII of the Civil Rights Act

129.   Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

130.   Plaintiff is a member of a protected class.

131.   Because of her race Plaintiff was subjected to the Defendant's unlawful discriminatory conduct, including the Agency's refusal to accommodate her request for a safe work environment in compliance with applicable law and Agency procedures and in violation of Title VII and the Tennessee Human Rights Act.

132.   Defendant's foregoing unlawful adverse actions and continued discrimination, including constructive termination and a termination, materially affected the terms, privileges and conditions of Plaintiff's employment.

133.   Plaintiff has been treated differently and subjected to different terms and conditions of her employment duties from the manner in which Defendant treated similarly

situated white employees.

134.   Plaintiff's race was a determining and motivating factor in Defendant's unlawful conduct towards Plaintiff.

135.   Further, the reasons proffered by Defendant for its unlawful conduct are inconsistent with the surrounding facts.  Defendant cannot substantiate any legitimate reason(s) for its unlawful conduct.

136.   Defendant's aforementioned conduct was intentional, deliberate, willful, malicious, reckless and in callous disregard of Plaintiff's rights.

137.   Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

138.   As a direct and proximate cause of Defendant's conduct, Plaintiff was humiliated, embarrassed and endured pain and suffering. Additionally, Plaintiff suffered past and future loss of income, benefits, promotions, promotional opportunities, career opportunities and costs. She is also entitled to all available legal and equitable remedies.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court award:

a.   Compensatory damages consistent with Title VII limits;

b.   Economic and financial damages including loss of promotional potential, reputation, lost wages, lost job benefits, and the like.

c.   Any medical costs and expenses incurred as a result of Defendant's unlawful conduct;

d.   Reasonable attorney fees, costs, and expenses incurred for this action;

e.   Equitable damages, including front and back pay, as well as declaratory, and

injunctive relief; and

  f.  Award such other and further relief as this Honorable Court deems just and proper.

## COUNT I
Sex Discrimination
42 U.S.C. §§ 2000e, et seq, Title VII of the Civil Rights Act

  139.  Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

  140.  Plaintiff is a member of a protected class.

  141.  Because of her gender Plaintiff was subjected to the Defendant's unlawful discriminatory conduct.

  142.  Defendant's foregoing unlawful adverse actions and continued discrimination, including constructive termination and a termination, materially affected the terms, privileges and conditions of Plaintiff's employment.

  143.  Plaintiff has been treated differently and subjected to different terms and conditions of her employment duties from the manner in which Defendant treated similarly situated white female employees.

  144.  Plaintiff's sex was a determining and motivating factor in Defendant's unlawful conduct towards Plaintiff.

  145.  Further, the reasons proffered by Defendant for its unlawful conduct are inconsistent with the surrounding facts.  Defendant cannot substantiate any legitimate reason(s) for its unlawful conduct.

  146.  Defendant's aforementioned conduct was intentional, deliberate, willful,

malicious, reckless and in callous disregard of Plaintiff's rights.

147.   Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of Respondeat Superior.

148.   As a direct and proximate cause of Defendant's conduct, Plaintiff was humiliated, embarrassed and endured pain and suffering. Additionally, Plaintiff suffered past and future loss of income, benefits, promotions, promotional opportunities, career opportunities and costs. She is also entitled to all available legal and equitable remedies.

WHEREFORE, Plaintiff respectfully prays that this Honorable Court award:

a.   Compensatory damages consistent with Title VII limits;

b.   Economic and financial damages including loss of promotional potential, reputation, lost wages, lost job benefits, and the like.

c.   Any medical costs and expenses incurred as a result of Defendant's unlawful conduct;

d.   Reasonable attorney fees, costs, and expenses incurred for this action;

e.   Equitable damages, including front and back pay, as well as declaratory, and injunctive relief; and

f.   Award such other and further relief as this Honorable Court deems just and proper.

### PRAYER FOR JURY TRIAL

Plaintiff demands trial by jury of all issues so triable.

Respectfully submitted,

By: _____

Brooke D. Hyman, *Pro se*
1928 Jefferson Avenue
9012185683

20

Memphis, TN 38104